## FORENSIC PSYCHOLOGICAL EVALUATION

NAME: AAFIA SIDDIQUI  CRIMINAL NUMBER 08 Cr 826(RMB)
DATE OF BIRTH: 03/02/1972  REGISTRATION # 90279-054
DATE OF REPORT: 6/20/09  DATE OF INTERVIEW: MAY 1, 2009
EVALUATOR: L. THOMAS KUCHARSKI, PHD

### IDENTIFYING INFORMATION:

Dr. Aafia Siddiqui is a 37 year old, purportedly twice married and divorced Pakistani woman with 3 children who is charged with the alleged offenses of Attempted Murder of United States Nationals, Attempted Murder of United States Officers and Employees, Assault on United States Officers and Employees and Discharge of a Firearm During a Crime of Violence in violation of Title 18 U.S.C. sections 2332(b)(1), 3238, 1114(3), 323(b), 111(a)(1)(b) and 924(c)(1)(A)(iii). Dr. Siddiqui is alleged to have fired on members of the United States Military, Agents of the FBI and Interpreters, prior to being interrogated in Grazni, Afghanistan. Dr. Siddiqui was evaluated in order to assist the court with determining her competency to stand trial pursuant to Title 18 U.S.C. section 4241(b).

### STRUCTURE OF THE EVALUATION

Dr. Siddiqui was interviewed in her room at the Federal Medical Center in Carswell, Texas on May 1, 2009 for approximately one and a half hours. She was interviewed with the assistance of Chris McGee, MSW a social worker at FMC Carswell. Mr. McGee was identified as the staff member with the best rapport with Dr. Siddiqui. Initially the intention was that he would provide an introduction in order to facilitate cooperation but it became apparent that Dr. Siddiqui would not participate unless he remained present throughout the interview. Given her very guarded presentation and because of the potential that Dr. Siddiqui would not cooperate, notes were not taken during the interview. Prior to the interview Dr. Siddiqui was informed that I am a licensed psychologist. She was informed of the purpose of the interview and the limits of confidentiality of which she appeared to have at least a general understanding. Dr. Siddiqui initially refused to cooperate but with encouragement by Mr. McGee and this evaluator spoke about some elements of her history and current situation. She refused to discuss many important elements of her past particularly information about her children and the five year period preceding her arrest.

Collateral interviews were conducted with her brother Mohammad Siddiqui, her sister Fowzia Siddiqui, mental health staff at FMC Carswell including Dr.Robert Gregg, Dr. Leslie Powers, Dr.Tami Yanez, Dr. Camille Kempke and Chris McGee, MSW. Nursing staff and the officer who admitted me to the facility, who offered that he had worked on the unit where Dr. Siddiqui resided were briefly interviewed. Attempts were made to interview mental health staff at MDC Brooklyn but I was not allowed to do so. Her attorneys Dawn Cardi and Chad Edgar were consulted throughout the evaluation process. Asif Hussain, a representative of the Pakistani Embassy who met with Dr.

1

*Defendant
Exhibit
DX 1*

Siddiqui on a number of occasions was interviewed on June 16, 2009. The following documents were reviewed:

1. The Administrative Order of Richard M. Berman, United States District Judge, Southern District of New York, dated 11/17/08.
2. The Sealed Complaint.
3. The Criminal Indictment.
4. The Forensic Psychiatric Evaluation of Gregory B. Saathoff, MD dated 3/15/09.
5. Medical Records including Psychology Data System reports of psychologists at MDC Brooklyn dated 8/4/08 to 10/1/08. Notes from the Medical file including notes written by Physician Assistant Brooks and Staff Psychiatrist Dr. McLean. Report of Dr. Guerrero-Cohen to the Disciplinary Hearing Officer.
6. Medical records from FMC Carswell including Psychology Data System notes of psychologists, medical record notes of Staff Psychiatrist Dr. Kempke, nursing progress notes dated 10/2/08 to 5/1/09.
7. Transcripts of Court Proceedings dated 12/17/08; 2/23/09; 3/26/09; 4/28/09.
8. Transcripts of Telephone calls by Dr. Siddiqui to her brother Mohammed Siddiqui dated 8/29/08; 10/03/08; 10/04/08; 10/9/08; 10/15/08; 10/16/08; 10/31/08; 11/04/08; 11/12/08; 11/17/08; 11/26/08; 12/02/08; 12/9/08; 12/17/08; 1/26/09; 3/24/09; 3/25/09; 3/28/09; 4/15/09; 4/22/09; 4/30/09; 5/5/09; 5/11/09; 5/14/09; 5/16/09; 5/18/09 .
9. Transcripts of Telephone conversations between Dr. Siddiqui and Asif Hussain of the Embassy of Pakistan dated 10/2308; 1/26/09; 5/19/09.
10. Transcripts of the Use of Force conducted at MDC Brooklyn.
11. Video Tapes labeled Sept 9, 2008 Eval and October 1, 2008 Eval.
12. A letter written by Dr. Siddiqui to the Warden of FMC Carswell entitled "Please Read This in Private at Home."
13. The Observation Log Book maintained at MDC Brooklyn.
14. The Affidavit in Support of a Search Warrant.
15. FBI Investigative Reports identified as Bates Materials 1-82; 84-725.
16. The Abstract of Dr. Siddiqui's Doctoral Dissertation entitled "Separating the Components of Imitation and a scientific publication co-authored by Dr. Siddiqui entitled "Reproduction of Scene Actions: Stimulus Selective Learning.
17. A document entitled "Why I am Not a Terrorist."
18. Medical Records from Medical College of Georgia.
19. A Video of her Interrogation by Afghan Authorities.
20. A Video of a Press Conference Given by her sister Faucia in Pakistan.
21. Numerous newspapers, press, internet blogs related to her background, arrest and detention in the United States.
22. Her Visa application.

## CLINICAL AND SOCIAL HISTORY

Dr. Aafia Siddiqui is a 37 year old woman who was born in Pakistan to an upper middle class family. Her father, who died of a heart attack in August of 2002, was a physician and her mother a social worker. Her mother is still living but is reportedly in

2

poor health and suffers from dementia. Dr. Siddiqui has two siblings a brother Mohammed, an architect who resides with his family in Houston, Texas and a sister Faucia a neurologist who resides in Karachi, Pakistan. Dr. Siddiqui's history has been detailed in three prior reports to the court and will not be reiterated here. Suffice it to say that Dr. Siddiqui has no prior documented history of mental health difficulties or criminal involvement. She was educated in the United States beginning her studies in Houston but transferred to the Massachusetts Institute of Technology where she obtained a bachelor's degree in biology. She went on to complete her PhD in cognitive neuroscience at Brandeis University in Boston in 2001. Her dissertation research involved a study of the effects imitation has on perceptual learning and memory.

In 1995 Dr. Siddiqui married Mohammed Amjad Khan through an arranged marriage. At the time her husband was completing his studies and residency in medicine and anesthesiology. The couple resided in the Boston area. Three children were born of this union. Mohammad Ahmed, currently age 12, Mariam Bint Khan currently age 10, and Suleman currently age 5. There is evidence that this relationship was very abusive. Her husband admitted to only one incident of domestic violence and minimized it to authorities. But review of the interviews with two of her former professors at Brandeis and interview with her sister Fowzia reveal that Dr. Siddiqui regularly was observed to have bruises on her face, suggesting substantially more abuse than admitted by her husband and raising concern regarding the veracity of his report. It is also noteworthy that in an interview by authorities on March of 2002, ████████████████████reported that Dr. Siddiqui consulted him regarding reporting child abuse to the Department of Social Services. Dr. Siddiqui's son Ahmed is currently in the custody of her sister Fowzia.

The whereabouts of the other children are unknown although Mohammed Khan claims that he has seen them in Karachi on at least a couple of occasions. ████

████████████████████████████████████████████ Given the concerns raised above about the veracity of Mr. Khan's reports and the fact that his statements occur in the context of a prolonged custody dispute where he has lost custody and has been denied contact with his children, the accuracy of his report is not known.

Dr. Siddiqui purportedly married a second time in March or April of 2003. Approximately one month later Dr. Siddiqui's second husband Ammar Al Baluchi was arrested and transferred to Guantanamo Bay allegedly. Dr. Siddiqui claims that she was unaware of his alleged connections to Al-Qaeda or any other terrorist organization or that he is the nephew of Khaled Sheik Mohammad.

Dr. Siddiqui's clinical history is not well known. There appears to have been no serious psychiatric difficulties prior to 2001 although in the interview ████████ her

first husband characterized her as having a paranoid personality. She appeared to function at a high level completing her doctoral studies, organized several Muslim education and charitable activities and appeared to be adequately raising her children. This occurred in the context of potentially serious domestic abuse. Following the attacks of 9/11, Dr. Siddiqui informed her husband that she wished to return to Pakistan. One of the reasons given at that time was that she believed that following 9/11, Americans were intending to abduct Muslim children and were converting them to Christianity. The strength and pervasiveness of this belief is unknown but it represents a very paranoid idea.

There are conflicting reports regarding the whereabouts of Dr. Siddiqui and her children for the five year period preceding her arrest. Some of these reports claim that she was held in either Bagram or a secret facility by U.S authorities and was tortured, a report denied by U.S authorities. Dr. Siddiqui in one of the FBI reports denies being held in Bagram. However she refuses to fully disclose where she was during this time. There is fairly convincing evidence, as reported by her brother and sister, that in 2003 she suddenly disappeared. She stopped cashing child support checks around the same time. Following an argument with her mother who she and the children were living with, an agreement was reached that they would go to Islamabad to live with her uncle. She reportedly left in a cab, phoned her mother from the train station, agreeing to call again when she reached Islamabad. She apparently never made it to her uncle's residence.

Although she has refused to discuss this period at any length, in a document written allegedly by her uncle ██████████████ her uncle reported in 2008 that she had been held captive and that her current captors were not as harsh as the former ones, that they allowed her infrequent outings. She reported that her previous captives kept her in isolation, wore masks and gloves and did not communicate with her. Noteworthy is the observation that her mother traveled to the United States in search of her daughter who she had learned was in U.S. custody from newspaper accounts in Pakistan. She also went to significant efforts to interview the reporters of the newspaper in an attempt to determine the source of their information. It is also noteworthy that Dr. Siddiqui spoke to Social Worker Chris McGee about being held in various camps, bases and prisons. Her being held captive was also referenced in her letter to the Warden listed above. At the time Mr. McGee believed that she came across as "very delusional. From the time she was first interviewed by agents, after she was shot, Dr. Siddiqui's thinking and speech is replete with themes of torture and fears that her children will be tortured.

What is reported is that Dr. Siddiqui became involved with a man named Abu Lubaba, who courted her using her concern for the protection of Pakistan against aggressive nations. Later she came to believe he was a "bad man." Abu Lubaba during this period issued a fatwa on Dr. Siddiqui to study germ and chemical warfare. ██████

4

In July of 2008 Dr. Siddiqui traveled to Ghazni, Afghanistan reportedly in order to find her second husband. She traveled with a young boy, who turns out to be her son, Ahmed because she reported traveling alone would draw attention to her. This child, as determined by DNA testing turns out to be her son Ahmed. It is unclear why Dr. Siddiqui attempted to conceal his identity, a deception noted to be significant by Dr. Saathoff, but it is potentially the case that she feared for his safety. Dr. Siddiqui was arrested by Afghan police outside the residence of the provincial governor. On her possession were a flash drive and numerous written and copied documents related to chemical, biological weapons, materials related to an AIDS vaccine, articles on curing aging, numerous drawings and references to US landmarks. On July 18, 2008 US military personnel and FBI agents arrived at the Afghan facility in order to interrogate Dr. Siddiqui. It is at this facility where the alleged offenses occurred.

## CURRENT MENTAL STATUS

Dr. Siddiqui was interviewed in her room at the Federal Medical Center in Carswell, Texas. She was extremely guarded, willing to provide only limited information, and often refused to answer certain questions. She attempted to control the interview, spoke directly to Mr. McGee who was present, and had little eye contact with this evaluator although eye contact improved as the interview proceeded. Dr. Siddiqui's thinking was very tangential moving from topic to topic in a disconnected manner. Her thoughts were replete with numerous conspiratorial ideas, some of which are consistent with her radical political beliefs others not. For example she spoke at length about conspiracies by the Jews, Israel, India and the United States. She also related a number of beliefs that appeared delusional. For example she believed that she was being poisoned and that staff at the facility were intending to kill her. She related that it was known to the inmates that a specific unnamed staff member took psychotropic medications. She stated that he therefore could kill her in her sleep and would not be punished because he would get off on an insanity defense. She reported that she believed that during the forced medical evaluation where blood was taken, that she was also injected with an unknown substance. She spoke at length about being dead, having been killed during the strip searches performed at MDC Brooklyn. This report of being dead had a metaphorical quality as she also appeared to be aware that she was alive as she made many statements about not caring what happened to her in the future. She reported that the naked video of her during the strip search was put on the internet for everyone to view. This humiliation, the belief that she will never leave prison or see her children, that she has been shamed and thus would be an outcast in the Muslim world and her community appears to be what she is referring to as being dead. She believes that the Court is responsible for this humiliation and has "already killed her." She believes that she was responsible for the fate of other inmates in the unit in that her engagement with them resulted in them receiving disciplinary actions.

Throughout the records Dr. Siddiqui has denied being mentally ill and as having very poor insight into her mental illness. From time to time she questions whether she is 'going crazy" but this is related to the stress she is experiencing and not an acceptance of her current psychiatric difficulties. She admitted to brief fleeting visions of her children,

5

of a man standing outside her cell and of a dog eating off a plate. These visions appear to be hypnogogic experiences and not true visual hallucinations. They are not enduring experiences that typically characterize true visual hallucinations. There appears to be no auditory, tactile or olfactory hallucinations. Significant depression has been noted throughout her incarceration. The outward affective presentation of depression has vacillated and at the time of this interview may have diminished to some degree as she was able to smile, her energy level appeared adequate and she engaged in the discussion with some vigor. However there is profound hopelessness, helplessness and sadness particularly centered on the well being of her children. She has repeatedly denied suicidal ideation stating that her fate is in God's hands.

Sleep and appetite appear to be significantly disturbed. Dr. Siddiqui complains about concentration difficulties that limits her ability to read the Koran, although she spends significant energy trying to read the Koran. Social interaction is significantly limited. She spends much of her time isolated in her room. Dr. Siddiqui appears oriented to person, place and time although her understanding of her current circumstances appears to involve some delusional interpretation. Judgment appears limited particularly around her legal representation and cooperation. There are no significant intellectual deficits, no severe memory impairment, although some concentration and therefore short term memory deficits of minor proportion are likely. No abnormal movements were noted. Her speech was tangential but of normal rate. Records of her interviews with the FBI are suggestive of some grandiose thinking as are some of her writings. No symptoms of mania were observed. Her demeanor was quite paranoid. It is noteworthy that the interview with her brother revealed phenomena very characteristic of those with paranoid delusional disorder to be discussed more latter in this report. There is a rather dramatic, hysterical quality to Dr. Siddiqui's presentation.

## INFORMATION GATHERED FROM THE RECORDS AND OTHER REPORTS.

Review of the records from the MDC Brooklyn facility reveal that on admission Dr. Siddiqui denied a history of psychiatric disorder and treatment and current psychiatric difficulties. The Intake Screening conducted on 8/4/08 revealed that no symptoms were identified. This is in contrast to many extreme beliefs presented to the FBI agents enroute to the United States and at the Craig Military Hospital in Afghanistan. At that time she spoke about president Musharaf being involved in a conspiracy where secret police from India had infiltrated a madrassa in Pakistan and used a chemical bomb to kill thousands of children. She was surprised that the agent was unaware of this event. She spoke to agents about India building dams that resulted in many Pakistanis dying of thirst. These ideas were not elicited by Dr. Guerrero Cohen during the Intake Screening. While these may or may not be beliefs that have their origins in radical political dogma, they would have raised concern of possible delusional thinking had they been presented on admission to mental health staff.

However, routine evaluations by psychologists that are required by BOP policy for inmates held in administrative detention began to raise concerns regarding Dr. Siddiqui's mental stability. For example on 8/23/08 Dr. Siddiqui was evaluated by Dr.

Corrine Ortega who reported that she was tearful through the interview, believes her son is being tortured, and that Americans were trying to get her transferred so she will have to watch her son being tortured. Dr. Ortega reported that she was guarded and paranoid. On 8/24/08 Dr. Ortega reported that Dr. Siddiqui had been "crying in her cell last night. Stated that she wanted to speak to psychology but then stated that she didn't want to because she does not want Psychology to think she is crazy."

Numerous repeated evaluations by Dr. Guerrero-Cohen raised concerns of potentially serious psychiatric difficulties. On 8/27/08 Dr.Siddiqui reported that she had difficulties reading the Koran due to inability to focus and concentrate. She reported what I believe to be hypnogogic experiences of visions of a dog eating off her son's plate. It is noteworthy that review of the log book kept by the officer observing her reported that Dr. Siddiqui was at 2:20 a.m. "walking around with a strange look on her face." On 8/29/08 she "expressed intense anguish at the thought of her children being tortured or at risk of torture." On 9/3/08 she was reported to have been crying different times during the day." On 9/5/08 she is noted to have been crying intermittently throughout the day and night. On 9/8/08 it is reported that her "eating improved... exhibits decreased sleeping...cell cleaning, wiping mattress with a damp cloth and cleaning every part of her bed." It should be noted that later Dr. Siddiqui reports that keeping her cell clean was a means to have the "good Angels" rescue her and take her to heaven. It is to be noted that there are reports of her repeatedly cleaning her cell. On 9/11/08 Dr. Guerrero-Cohen was called by custody staff to evaluate Dr. Siddiqui. She did so outside of the view of Dr. Siddiqui listening to what she told the Operations Lieutenant. At that time Dr. Siddiqui was crying hysterically stating that she saw a man standing outside her cell who told her son was in danger.

On 9/12/08 Dr. Guerrero-Cohen interviewed Dr. Siddiqui and reported that Dr. Siddiqui presented with visual and auditory hallucinations and persecutory delusions. She observed that "her verbalizations were consistent with log entries which also reflect paranoid ideas as well as paranoid beliefs made to the PA on 9/10/08. Apparent lack of insight into her mental illness. Believes video placed on internet," referring to the video of the strip search or forced medical examination. "Verbalized that staff could be injecting something into her to make her break Ramadan."

On 9/14/08 Dr. Siddiqui informed Dr. Lori Nichols "you know they already killed me? They took my clothes off and made videos of me." On 8/27/08 Dr. Perry Hess reported that he was "unable to determine whether last night's irrational statements reflect fantasies, malingering or delusional beliefs." On 9/20/08 Dr. Kari Schlessinger reported that her review of the log book revealed "1 hour of sleep since yesterday." Dr. Guerrero-Cohen similarly noted on 9/15/08 that she slept a total of 5 hours in a 24 hour period, 2.15 hours between 1:45pm and 4:00pm and 2.45 hours this morning between 7-9:45 a.m. These reports are consistent with my review of the MDC log book and demonstrate significant diminished and disrupted sleep symptoms characteristic of a number of psychiatric disorders, particularly depression. It should be noted that this magnitude of sleep difficulty is difficult to fake as are a number of symptoms presented by Dr. Siddiqui.

Medical records from FMC Carswell reveal a similar pattern of beliefs and behavior that raises concerns regarding the presence of serious psychiatric difficulties. On admission she was evaluated by Dr. Leslie Powers who reported that Dr. Siddiqui was hysterical, crying, and fixated on strip searches stating "that's what killed me the last time." "They must have sent me here to prove that I am dead since I am still talking." She reported to Dr. Powers that the camera "killed her over and over." There are numerous  comments of being dead in the record. It is clear that this is a very irrational statement bordering on if not indicative of a formal thought disorder. Formal thought disorder is another symptom of mental illness that is very difficult to feign.

On 10/3/08 Staff Psychiatrist Camille Kempke evaluated Dr. Siddiqui and reported that "her story remains consistent. She only sees her baby and young daughter. They only stay for a few moments (hypnogogic). Believes the Court does not have her daughter. She may be with the original people who kept her." She went on to report that her affect was very "labile, patient appears genuinely confused, rambling to a discussion of blood, her deceased father, upset with fight with her mother." Dr. Kempke went on to report "My opinion is that there is a 99% certainty that she is psychotic." On 1/30/09 Dr. Kempke wrote a four page psychiatric encounter note. During the interview of about an hour's duration Dr. Siddiqui related a number of her beliefs regarding elaborate conspiracies of Zionists having infiltrated all branches of state government, her efforts that would go against world peace, bad people who would do experiments which involved putting her in her current situation. She spoke of a kind woman psychiatrist who could "do things with her eyes." She reported that on the day she was picked up in Afghanistan she was participating in one of these experiments. Seemingly unrelated she reported "there are no glass bottles."

On 11/17/08 Dr. Kempke reported that Dr. Siddiqui stayed in her room afraid of being set up by other inmates and taken to M-3 where she would be poisoned. On 3/2/09 Dr. Kempke reported that Dr. Siddiqui presented as "awake, alert, cooperative...Speech run on, hard to interrupt, flight of ideas vs. tangential speech. Mood full range of affect. Worry about others. Possible delusions of paranoia, no current hallucinations (though possibly some illusions/hypnogogic phenomena at HS") (hour of sleep).

On 4/14/09 another evaluation by Dr. Kempke revealed beliefs of a spreading conspiracy, of being brainwashed by the "eyes" technique, reports that her room is bugged. Dr. Kempke reported that Dr. Siddiqui's "Speech run on, hard to interrupt, flight of ideas vs. tangential speech, possible delusions of paranoia." In spite of the claims by both Drs. Johnson and Saathoff that Dr. Kempke had come to view Dr. Siddiqui as much improved and likely to be malingering, this assessment that occurs a month after their evaluations and consultation, clearly indicates that she observed very serious psychiatric difficulties. Again several of these symptoms such as flight of ideas and tangential speech are very difficult to feign and those who attempt to malinger rarely think that these symptoms are characteristic of mental illness and therefore do not present with these symptoms. In contrast those with bona fide mental illness do present symptoms of this nature.

8

## COLLATERAL INTERVIEWS

On May 1, 2009 Dr. Gregg, Powers and Yanez were interviewed at FMC Carswell as was Chris McGee, MSW, Nurse Whitehead and the Correctional Officer who admitted me to the facility. I could not see his nametag clearly but he spontaneously reported that he had worked the unit where Dr. Siddiqui was housed. I also reviewed the report authored by Drs. Powers and Gregg in which they opined that Dr. Siddiqui was mentally ill and not competent to proceed. I discussed their findings as well as their overall impression of Dr. Siddiqui and the case. Each expressed a degree of uncertainty about Dr. Siddiqui's mental condition in light of the opinions offered by Drs. Saathoff and Johnson that they had only recently become aware of and that were in contrast to their opinion expressed in the initial report to the court. Mr. McGee who was present during the interview with Dr. Siddiqui reported that she was very tangential throughout the interview. He reported that on other occasions Dr. Siddiqui would bring up topics of being dead, "dead to her mother, dead to her religion." Dr. Siddiqui spoke to him about "being held in various camps, bases and prisons very briefly. Related a history of abuse. He stated that she spoke about her children…came out very delusional." Nurse Whitehead reported "very limited interaction from the get go, but inconsistent engages officers. Not disorganized no need for redirection."

Dr. Tami Yanez reported an interaction with Dr. Siddiqui where she attempted to warn her that Jews were trying to work behind the scenes and would do things that would ultimately affect unsuspecting African Americans and Hispanics. During another meeting Dr. Siddiqui informed her that if she were to tell everything she could save the lives of thousands of children but doing so would result in the death of her own children.

Interviews with her brother Mohammad Siddiqui revealed that Dr. Siddiqui reported experiences and beliefs particularly conspiratorial ideas, visions of her children, the belief that she was dead and that people were trying to harm her that were consistent with what was observed by clinical staff at MDC Brooklyn and FMC Carswell as well as this evaluator. It was his impression that his conversations with his sister were unusual and it was his belief that she is mentally ill. He reported that he believes his sister was abducted and held captive at least part of the time since her disappearance. Mohammad Siddiqui was initially approached by this evaluator to elicit his support in convincing his sister to cooperate and to provide information to her on the consequences of being found incompetent. During the initial interview, prior to my traveling to FMC Carswell I was aware that the Pakistani Embassy had been involved and that they were conveying to Dr. Siddiqui that if she were found incompetent she would be repatriated to Pakistan. After review of the reports of Drs. Johnson and Saathoff I was concerned that Dr. Siddiqui was potentially malingering and that if the secondary gain of being repatriated was removed and she had an accurate understanding of the consequences of being found incompetent that she was more likely to cooperate with my evaluation and her attorneys.

Mohammad Siddiqui agreed to try to educate his sister to the consequences of being found incompetent and to encourage her to cooperate in her defense. Her response to his efforts was to question whether "they had gotten to him too?" This response is