very noteworthy and diagnostically characteristic of those with delusional disorder. Those with delusional disorder rarely accept being mentally ill and typically will fold anyone who questions their beliefs into their perceived conspiracy. On another occasion Dr. Siddiqui similarly accused her brother of conspiring against her. He stated that "if he tries to put a positive spin on it" he's accused of conspiring. As a result Mohammad Siddiqui related that he no longer talks to his sister about these matters and tries to avoid discussions where his allegiance to her would be called into question.

On 6/16/09 Asif Hussain a representative of the Pakistani Embassy was interviewed. Mr. Hussain has visited with Dr. Siddiqui and has spoken to her on the phone on a couple of occasions. He reported that he last saw her 6/9/08. He first qualified is opinions by acknowledging that he is not a psychiatrist. He reported that when he saw her at MDC Brooklyn he thought she was "totally traumatized, unable to conduct herself." He found her to be very tangential "off beat, jumps to something not relevant, paranoid with whole world against her. She sees everything from a conspiracy point of view." He also reported that she had informed him about her visions of her children.

Review of the telephone transcripts of Dr. Siddiqui with her Brother Mohammad and Mr. Hussain reveals that during these conversations, similar beliefs and perceptions are reported. There is a great deal of hopelessness and fatalism expressed in these transcripts, in the medical record and in her interview with this evaluator. This hopelessness and fatalism extends to the court and future proceedings.

On 6/19/09 Dr. Camille Kempke was interviewed via telephone. She reported that she is the "only one she (Dr. Siddiqui) speaks to." In marked contrast to the report by other evaluators who had come to view Dr. Siddiqui as malingering, she reported: "I continue to believe she is grossly psychotic....can't follow her conversations" and that she continues to make statements such as "maybe I'm dead." This type of questioning and uncertainty about symptoms is in marked contrast to the clinical presentation of malingerers.

## CLINICAL FORMULATION

After review of the medical records, the forensic evaluations submitted by Drs. Johnson, Saathoff, Powers and Greg, my review of the transcripts of telephone conversations, collateral interviews with mental health staff, her brother, Mr. Hussain, my review of the 302 investigative reports of the FBI, Dr. Siddiqui's writings and materials found on her following her arrest it is my opinion that Dr. Siddiqui currently presents with a mental illness best characterized as a Delusional Disorder of the Paranoid Type. She is in my opinion also significantly depressed with symptoms of hopelessness, helplessness sleep difficulties and poor concentration. Notwithstanding Dr. Saathoff's analysis of the absence of sleep disorder it is indisputable that she evidenced significant sleep disorder during her stay at MDC Brooklyn, difficulties noted by a psychologist who reviewed the log before their attempts to evaluate her. While some of her beliefs are

10

consistent with radical political ideology, typical of Muslim militants dedicated to jihad, many others exceed political ideology.

For example her beliefs that Israel, the United States and India are conspiring to invade Pakistan, that Jews are responsible for 9/11 and have infiltrated American political and governmental organizations are not bizarre in the cultural context of militant jihad beliefs. However just because they are consistent with radical jihadist ideology does not exclude the possibility that they can be so extreme as to be of delusional proportions.

In contrast her beliefs that she was injected with a substance to make her break Ramadan, that she is being poisoned, that people use the "eye technique" to influence her, her belief that she is responsible for what happens to other inmates, that other inmates are trying to "set her up" so she can be poisoned, that an officer taking psychotropic medication could kill her and not be punished by getting off on an insanity defense, that the naked video of her strip searches and forced medical treatment were placed on the internet all represent examples of her delusional thought process.    There are also some grandiose ideas that she can broker peace between the Taliban and Americans and other activities leading to world peace. Note that some of the materials found on her relate to an AIDS vaccine and cures for aging that she found of such special importance as to carry them with her. Some of her writings, developing viruses which would not affect children or women, or only certain ethnic groups, magnets to propel airplane propellers, using them even on gliders that don't have propellers, creating powerful poisons from opium, nicotine, cannabis, cocaine all appear grandiose and potentially frankly psychotic. I do not believe that the visual anomalies that Dr. Siddiqui experiences are visual hallucinations but represent hypnogogic experiences. Hypnogogic experiences are fleeting visual anomalies that are quite common particularly in sleep deprived and depressed people. Visual hallucinations are more sustained, persistent experiences that usually involve insects, snakes or other frightening organisms. They are common in drug withdrawal and in dementia.

Like many patients that suffer from delusional disorder, Dr. Siddiqui's behavior is not grossly disorganized. Her reported perceptions and beliefs do not globally impact on her everyday life. She is able to care for her basic needs, appear on the surface to be reasonably functional. By definition delusional disorder is characterized by nonbizarre beliefs that could have a basis in reality but are highly unlikely. Many of these beliefs have their origin in some reality based experience. Note that Dr. Siddiqui's picture and case is all over the internet, that torture is a very current concern, that naked pictures of detainees have been disseminated over the internet. In this regard behavioral consistency across situations and between various individuals is not relevant because delusionally disordered individuals only make manifest their pathology when the interaction taps the delusional content. By way of example a defendant I evaluated for the federal court for sending threatening communication, believed that he would impregnate 500 select women one who would give birth to the second coming of Christ. He also believed that he knew the location of Noah's ark. One of the women he had identified was the ice skater Katarina Wit. He stalked her around the world attending her performances and throwing roses on the ice rink. When his overtures were thwarted he began threatening.

11

His stalking was facilitated by the fact that he was an airline pilot for a major international airline. Another defendant who believed she was dying of kidney and thyroid disease brought a bomb to the federal court in Long Island in order to bring her delusionally based concerns to the attention of a federal judge. She was able to write and submit several motions to the court that presumably had legal merit. She was nonetheless not competent to proceed as she lacked a rational understanding. In another case of delusional disorder, the defendant who was charged with impersonating an immigration attorney suffered from the delusion that his daughter was killed by INS agents who, in turn, sold her identity to obtain a green card. This defendant was noted to have been a quite competent immigration attorney.

Those with delusional disorder deny being mentally ill convinced that their beliefs are real. When confronted regarding the lack of validity of their beliefs, that they represent delusions and that they are therefore mentally ill the typical response is to incorporate the accuser into the delusion, making them part of the conspiracy. This is what Dr. Siddiqui did when her brother tried to get her to understand the process and to cooperate. The following clinical description is taken from an abstract of the Comprehensive Textbook of Psychiatry and the Journal of Clinical Psychiatry.

**Clinical presentation** (Manschreck, 1999; Manschreck, 2000; Fennig, 2005)

- The mental examination is usually normal with exception of the presence of abnormal delusional beliefs.
- In general, patients are well groomed and well dressed without evidence of gross impairment.
- Speech, psychomotor activity, and eye contact may be affected by the emotional state associated with delusions.
- Mood and affect are consistent with delusional content; for example, patients with persecutory delusions may be suspicious and anxious. Mild dysphoria may be present without regard of type of delusions.
- Tactile and olfactory hallucinations may be present and may be prominent if they are related to the delusional theme (eg, the sensation of being infested by insects, the perception of body odor). Medical causes of tactile and olfactory hallucinations, such as substance intoxication and withdrawal, temporal lobe epilepsy, and others, should be ruled out. Auditory or visual hallucinations are uncommon but, if present, they are not prominent.
- The thought content is notable for systematized, well-organized, nonbizarre delusions that are possible to occur, such as delusions of being persecuted, being loved by a person of higher status, being infected, having an unfaithful spouse, and others. Delusional concepts may be complex or simple, but bizarre beliefs such as delusions of thought insertion, and thought control are more common in schizophrenia. Contrary to schizophrenia, the thought process is usually not impaired; however, some circumstantiality and idiosyncrasy may be observed.
- Memory and cognition are intact. Level of consciousness is unimpaired.
- Patients usually have little insight and impaired judgment regarding their pathology. Police, family members, coworkers, and physicians other than psychiatrists are usually the first to suspect the problem and seek psychiatric consultation. Seeking corroborative information, when permitted by the patient, is often crucial.
- Assessment of homicidal or suicidal ideation is extremely important in evaluating patients with delusional disorder. The presence of homicidal or suicidal thoughts related to delusions

12

should be actively screened for and the risk of carrying out violent plans should be carefully assessed. Reid (2005) pointed out that some types of this illness—erotomanic, jealous, and persecutory—are associated with higher risk for violence than others (Reid, 2005). History of previous violent acts as well history of how aggressive feelings were managed in the past may help to assess the risk.

1. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). Fourth Edition, Text Revision (DSM-IV-TR). *Washington, DC: American Psychiatric.* 2000.

2. Fennig S, Fochtmann LJ, Bromet EJ. Delusional and shared psychotic disorder. *Kaplan & Sadock's Comprehensive Textbook of Psychiatry. 8th ed.* 2005:1525-33.

3. Manschreck TC. Delusional disorder: the recognition and management of paranoia. *J Clin Psychiatry.* 1996;57, Suppl 3:32-8. [Medline].

4. Manschreck TC. Delusional and Shared Psychotic Disorder. *Kaplan & Sadock's Comprehensive Textbook of Psychiatry. 7th ed.* 2000:1243-64.

It is my opinion that there is very strong evidence that Dr. Siddiqui is not malingering. My opinion is based on the following:

1. First and most important, Dr Siddiqui denies being mentally ill. As can be seen from my resume I have spent a considerable part of my recent research career studying ways to detect malingering and denial of psychiatric disorder. It is virtually unheard of that a defendant attempting to portray herself as mentally ill and malinger psychiatric disorder would go to such efforts to deny mental illness. The opposite is almost universally true. Malingerers go to great lengths to convince evaluators that they suffer from extreme psychiatric symptoms. In spite of repeated reference to denial of psychiatric disorder cited by Dr. Johnson she opines that Dr. Siddiqui is malingering.

2. Dr. Siddiqui has avoided mental health professionals, on one occasion going so far as to retract her request to see psychology services at MDC Brooklyn for fear that they would "think she is crazy." Being viewed as crazy is exactly what the malingerer seeks. Malingerers go out of their way to draw attention to their feigned mental illness. Dr. Siddiqui does exactly the opposite, avoids mental health professionals and tries to conceal her psychiatric difficulties. On the trip to New York from Afghanistan she related a number of beliefs, mostly conspiratorial to FBI agents. On arrival at MDC Brooklyn she denied all symptoms. Her intake screening was devoid of any psychiatric concerns. As opposed to trying to impress mental health staff of her symptoms she concealed them. Mental health staff at MDC Brooklyn utilized an approach where they stayed out of view of Dr. Siddiqui while she conversed with correctional staff as a means of overcoming her unwillingness to openly discuss her symptoms with mental health staff. She has consistently refused mental health treatment or services.

3. Dr. Siddiqui presents with symptoms that are difficult to feign. Specifically, she has uniformly been viewed by mental health staff and lay persons as tangential, irrelevant, with flight of ideas. Maintaining a consistent thought pattern and speech that rambles to irrelevancies requires a high level of concentration, focus and persistence that is rarely possible. She evidenced significant sleep disorder at MDC Brooklyn with a documented record of one or two hours sleep over a significant period.

13

4. There is behavioral confirmation of her hypnogogic experiences. Note that the log book entry of the officer observing her noted that she was behaving strangely at 2:20 am on the morning she reported seeing the dog in her cell.

5. She has been extraordinarily consistent in her symptom presentation to mental health staff, her brother and Mr. Hussain. All reported that she reported being dead, her hypnogogic experiences and her conspiratorial ideas regarding Jews, India and the United States. All reported being informed about attempts to murder, poison or otherwise harm her. Malingerers have difficulty maintaining such consistency across different contexts. They usually don't see the need to convince other than mental health staff of their feigned symptoms.

6. Most malingerers attempt to convince evaluators that they experience ongoing auditory hallucinations, that are persistent, continuous, uncontrollable and that they are unable to adapt to the hallucinations. Malingerers are required to simply report that they are hearing voices, a presentation that requires little effort. Dr. Siddiqui has reported fleeting visual hypnogogic experiences common to those with depression and those who are sleep deprived. They are thematically related to her lost children and very connected to the worries and fears she has for their wellbeing. They are not persistent, pervasive nor do they dramatically impact her everyday behavior. This is in contrast to Dr. Saathoff's claim that their diminishing over time is evidence of malingering. This might represent the normal course of these experiences as she adjusts to her situation. However, since medical records from May 1st have not been provided from FMC Carswell in spite of requests it is not certain that such a diminution has occurred.

7. If Dr. Siddiqui is malingering she would be capable of fully understanding the consequences of being found mentally ill and incompetent. This would include the likelihood of involuntary treatment with antipsychotic medication, something she will find very difficult to accept. If not restored she will become subject to dangerousness proceedings pursuant to § 4246 and civil commitment potentially for the rest of her life. Therefore there is very little secondary gain to being found incompetent. Clearly Dr. Siddiqui is very intelligent and if not mentally ill would be very capable of assessing these risks. In her case, in reality there is no secondary gain and potentially a greater risk.

8. Dr. Saathoff in coming to his opinion that Dr. Siddiqui is malingering relied on a history of deception, specifically failing to disclose the true identity of her son, as part of his basis for coming to that conclusion. There are other more probable reasons that she did so other than a propensity to deceive including fear for the well being of her son. Dr. Saathoff cites one of my research papers in his discussion of malingering but he seems not to have read the recent literature, including some of my own recent work on psychopathy, antisocial personality disorder and malingering. The DSM-IV diagnostic manual advises that malingering be suspected whenever there is a diagnosis of antisocial personality disorder presumably because antisocial defendants have a propensity to deceive. Psychopaths represent an even greater propensity to deceive in that the clinical definition of psychopathy involves pathological lying and manipulation. I have shown

14

that reliably identified severe psychopathic defendants are only slightly more likely to malinger psychiatric disorder than are nonpsychopaths and those with any personality disorder are equally likely to malinger than those with antisocial personality disorder. In both cases nearly half of severe psychopaths and those with antisocial personality do not attempt to malinger psychiatric disorder as assessed by all validated measures of malingering. There is no useful relationship of a history of deception and a propensity to malinger that is diagnostically of any value and would withstand a Daubert or Frye like challenge.

9. Dr. Siddiqui is very guarded and refuses to speak in any detail about the domestic violence and any past trauma. Malingerers are overly forthcoming when discussing past trauma as they believe that trauma and abuse are etiologically significant. Those who are abused find it very difficult to speak about past trauma while malingerers are overly willing to address past trauma often bringing up traumatic experience without even being asked. Such a presentation is characteristic of malingering.

If Dr. Siddiqui is malingering she would readily admit to being mentally ill. She would go out of her way to engage mental health staff in an attempt to impress upon them the seriousness of her psychiatric difficulties. She would report ongoing persistent auditory hallucinations and would attempt to present behavior that would support her claims of hearing voices. She would readily talk about her traumatic past. She would not present with symptoms that are difficult to feign such as tangentiality. She would not present the same consistent symptoms to family members and others outside of the evaluation context. Dr. Siddiqui's presentation is diametrically opposed to everything we know about the clinical presentation of malingerers.

## CLINICAL OBSERVATIONS RELEVANT
## TO COMPETENCY TO STAND TRIAL

No direct formal assessment of Dr. Siddiqui's competency to stand trial was possible and no evaluator has been able to question her about her factual and rational understanding of the proceedings against her or to assess directly her ability to assist counsel. All of the opinions provided to the court have relied on collateral and observational information. In spite of her unwillingness or inability to engage evaluators, there is a great deal of information that can be relied upon to form opinions about each of the elements of competency to stand trial.

Dr. Saathoff and Dr. Johnson's basis of their opinion regarding competency to stand trial is that Dr. Siddiqui is malingering, is not mentally ill and therefore she is competent as incompetency is predicated on either a mental illness or mental defect. No mental illness, no mental defect de facto competent.

Dr. Powers and Gregg's basis for their opinion in the initial report to the court assumed a history of torture that was the etiology of post traumatic stress disorder (PTSD) and that this mental illness impaired Dr. Siddiqui's competency. When they were convinced that no torture had occurred they concluded that there could be no PTSD,

15

she was malingering, had no mental illness or mental defect therefore de facto competent. It is noteworthy that the original diagnosis provided to the court was major depression severe with mood congruent psychotic features with a rule out diagnosis of PTSD. Even if there is no history of torture or other significant trauma, a conclusion that cannot be reached based on the information I reviewed, the presence of a mental disorder other than PTSD cannot be discounted.

In the original report to the court Drs. Powers and Gregg reported based on their direct observation of Dr. Siddiqui that "Much of the content of her conversations were tangential and difficult to follow". Again this is a symptom that is difficult to feign, was noted by this evaluator on May 1, 2009 and has been noted by others including her brother and Mr. Hussain. This tangentiality in and of itself impacts upon Dr. Siddiqui's competency to stand trial as it affects her ability to rationally communicate with counsel, her ability to testify or allocate. It is unlikely that this symptom is feigned and it is likely that it continues until today.

Suffice it to say that Dr. Siddiqui is a very intelligent person with significant exposure to United States culture and institutions. It is highly unlikely that she does not possess a factual understanding of the operation of the court, the roles and functions of courtroom personnel, the available pleas, the meaning of important legal concepts, etc. It is therefore my opinion that Dr. Siddiqui most likely possesses a factual understanding of the proceedings against her or if she does not she is capable of being educated by counsel.

In contrast, it is my opinion that Dr. Siddiqui presents with a mental illness best characterized as a delusional disorder. She is also depressed. These delusions are distinct from her radical political beliefs. They include the belief that the court is part of a conspiracy to have her killed, tortured and/or have her witness the torture of her children. She believes the court was not only responsible for ordering the strip search and the forced medical treatment but was central in putting video of her naked on the internet. She believes that the court was responsible for injecting her with a substance designed to make her break Ramadan. She believes that the outcome of her trial is predetermined, that she will get the death penalty and has stated to this evaluator that there is no need to go to trial or work with her attorneys in her defense because of this predetermination. She requested that I inform the court to just impose the death penalty or whatever penalty it chooses and to not bother her with the formality of proceedings.

Dr. Siddiqui harbors a number of beliefs that may or may not represent delusions. The line between delusions and radical ideology may be obscure. What is clear is that many of the beliefs regarding the court exceed those that characterize radical Islam. Dr. Siddiqui also harbors the belief that she is dead, that she was killed by those who implemented the forced strip search and medical treatment, procedures ordered by the court. The metaphorical nature of this belief is captured by her comments to Asif Hussain, Dr. Kempke and Mr. McGee where she stated that she was "dead to her mother and dead to her religion." This metaphorical death results from her delusional belief that pictures of her naked were put on the internet and do not represent a delusion per se but

16

the consequences of a delusion. This belief represents a very irrational, disordered thought process that directly impacts her motivation to assist counsel and her rational understanding of the proceedings against her.

It is therefore my opinion that Dr. Siddiqui currently presents with a mental illness best characterized as a delusional disorder. She is also depressed. Her delusional beliefs directly involve the Court and significantly impair her ability to assist counsel. Specifically, she does not believe that the Court is engaged in a process of adjudicating her innocence or guilt. To her delusional way of thinking, the court process represents an extension of her history of being persecuted. She believes that the court process is irrelevant given that her arrest and prosecution are the result of a conspiracy. Her tangentiality significantly impairs her ability to communicate with counsel to testify in her own defense, to allocute if necessary and limits her ability to relate her account of the alleged offenses to defense counsel. As has been evident throughout the record, she is difficult to follow, she rambles to irrelevant issues, making her difficult to understand. Attempts to redirect her or to point out inconsistencies in her thought processes leads to distrust and incorporation of those who disagree with her into her delusional system. Thus far, it is apparent that she has rejected court-appointed counsel, private counsel and even Pakistani counsel. Her beliefs that the outcome of the proceedings is predetermined is based on her delusion that the court process is part of a conspiracy which significantly impairs her motivation to participate as she does not view the court process as meaningful.

She has refused to assist counsel even though not doing so could have a very serious adverse outcome irrespective of whether she is found competent or incompetent. It is therefore my opinion within reasonable psychological certainty that Dr. Siddiqui currently possesses a factual understanding of the proceedings against her but that her rational understanding and her ability to assist counsel are seriously adversely impacted by her mental illness. It is therefore my opinion that Dr. Siddiqui is currently not competent to stand trial.

## CLINICAL OBSERVATIONS RELEVANT TO RESTORATION OF COMPETENCY TO STAND TRIAL

Currently Dr. Siddiqui presents with a delusional disorder paranoid type and significant depression. There is limited research on the efficacy of various pharmacological treatments for delusional disorder. The research and my own experience suggests that antipsychotic medications are effective in about half of the cases studied. I have observed some very dramatic improvements with marked reduction in delusional thinking in patients treated with antipsychotic medications. There are no other know effective treatments for delusional disorder. Dr. Siddiqui is unlikely to initially voluntarily accept treatment. She has consistently refused treatment. If the court finds that Dr. Siddiqui is currently incompetent to stand trial it is recommended that she be committed to the custody of the Attorney General for restoration of competency to stand trial pursuant to Title 18 USC sec 4241(d). The court will need to consider the legality

17

and appropriateness of involuntary medication in relation to <u>Sell v United States</u>.

Respectfully Submitted,

L. Thomas Kucharski, Ph.D.
Licensed Psychologist
Chair Department of Psychology
John Jay College of Criminal Justice

18