UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

                         08 Cr. 826 (RMB)

    - against -


AAFIA SIDDIQUI,

                   Defendant.

------------------------------------------------------------X


# DEFENDANT AAFIA SIDDIQUI'S *IN LIMINE* MOTION TO EXCLUDE UNDER *DAUBERT* AND FRE 702 THE TESTIMONY OF D.J FIFE PROFFERED TO NEGATE THE EXCULPATORY FACT THAT DR. SIDDIQUI'S FINGERPRINTS WERE NOT ON THE M4 RIFLE

DAWN M. CARDI & ASSOCIATES
Dawn M. Cardi, Esq.
Chad L. Edgar, Esq.
Two Park Avenue, 19th Floor
New York, New York 10025
Tel.: 212.481.7770
Fax: 212.684.3008
*Attorneys for Aafia Siddiqui*

Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
Tel. (813) 247-4500
Fax (813) 386-6211
*Attorney for Aafia Siddiqui*

SWIFT & MCDONALD, P.S.
 Charles Swift
2003 Western Avenue, #330
Seattle, WA 9812
Tel. (206) 441-3377
Fax (206) 448-2252
*Attorney for Aafia Siddiqui*

Elaine Whitfield Sharp, Esq.
196 Atlantic Avenue
Marblehead, MA 01945
Tel. (781) 639-1862
Fax (781) 639-1771
*Attorney for Aafia Siddiqui*

# TABLE OF CONTENTS

Table of Contents..............................................................................................i

Motion......................................................................................................1

Introduction............................................................................................3

The Government's Proffer of Dr. Fife's "Ten Percent" Opinion.....................3

The Legal Standard for  Admissibility of Expert Opinion Proffered as
"Science".................................................................................................5

Barnum Study: Flawed Methodology and Conclusion.................................7

The Experience of Mr. Fife Will Not Fill the Gap in the Government's
Case........................................................................................................12

Mr. Fife's methodology is flawed: the Court Should Exclude the "Ten

Percent"Opinion....................................................................................14

Conclusion.............................................................................................16

Request for
Relief......................................................................................................20

i

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------X
UNITED STATES OF AMERICA

               Plaintiff                  08 CR. 826 (RMB)

      -against-

AAFIA SIDDIQUI,

              Defendant.

--------------------------------------------------X

Pursuant to Federal Rules of Evidence 104(a), 702, 401, 402 and 403, and based on the Motion *in Limine* and accompanying Memorandum of Law in Support, and the exhibits attached thereto, Defendant Aafia Siddiqui through her attorneys, moves this Court to:

1.      Exclude the opinion testimony of D.J. Fife that latent fingerprints are recovered from firearms only about "ten percent" of the time, where:

2.      The "ten percent" opinion is not scientifically reliable under the *Daubert, Joiner* and *Kumho* trilogy (now incorporated into FRE 702);

3.      The unscientific nature of the "ten percent" opinion makes it irrelevant to resolve a material fact in issue under FRE 401; and

4.      The "ten percent" opinion is more unfairly prejudicial than probative under FRE 403 in that this unscientific opinion testimony is designed to negate the powerful exculpatory forensic fact that Dr. Siddiqui's fingerprints were not on the M4 rifle;

1

5.	Schedule a hearing at the United States Courthouse, 500 Pearl Street, New York, New York, on a date to be determined, on the motion at which evidence will be taken and an order sought excluding from trial the "ten percent" opinion testimony of D.J. Fife;

6.	This motion is based upon the facts and law as presented in the Memorandum of Law.

**MEMORANDUM OF LAW**

**1. Introduction.**

The critical factual contest in this case is whether Dr. Siddiqui grabbed the

Chief Warrant Officer's M4 Assault Rifle and fired it at him and other United

States officers and employees in Ghazni, Afghanistan on July 18, 2008. These

alleged actions are the gravamen of the Government's case against Dr. Siddiqui

for attempted murder and assault.[1]  If Dr. Siddiqui did not pick up the M4 assault

rifle and did not point and shoot it at the Americans in the room at the

headquarters of the Afghan National Police (ANP) on July 18, 2009, then she is

actually innocent of the charges or, at the very *least*, there is reasonable doubt that

Dr. Siddiqui committed any of the crimes with which she is charged.

**2. The Government's Proffer of Dr. Fife's "ten percent" Opinion**

As the Court may be aware, Dr. Siddiqui's fingerprints were not on the

M4 rifle that she is alleged to have grabbed and fired at the warrant officer and

others on that day in Afghanistan.[2]  The fact that Dr. Siddiqui's prints were not on

---

[1] Specifically, a seven-count indictment accuses Ms. Siddiqui, as follows: Count 1 - armed assault of United States Officers and Employees, 18 USC, §§ 2332(b)(1) and 3238; Count 2 - attempted murder of U.S. officers and employees, 18 USC, §§ 1114(3) and 3238; Count 3 – armed assault of United States Officers and employees, 18 USC §§§ 111(a)(1), 111(b) and 3238; Count 4 – discharge of a firearm during a crime of violence, 18 USC §§§ 924(c)(1)(A)(iii), 924(c)(1)(B)(ii) and 3238; Count 5 – Assault of US officers and employees, 18 USC §§ 111(a)(1) and 3238; Count 6 – assault of US officers and employees, 18 USC §§ 111(a) (1) and 3238; Count 7 – 18 USC §§ 111(a)(1) and 3238. (*See*, Indictment, ECF Doc. 8.)

[2] In fact, there is a whole slew of exculpatory evidence in this case: Dr. Siddiqui's DNA was not found on the M4 rifle; no bullets, casing or shrapnel of any kind from the M4 rifle were found in the quite small enclosed space where Dr. Siddiqui was alleged to have fired this firearm; in fact, there is no indication that

the rifle is one that may reasonably be expected to sway the jurors seated in the case towards acquittal.

On learning that there are no fingerprints on the M4 rifle, the Government now plans to negate this powerful forensic, exculpatory fact with the testimony of FBI employee D.J. Fife, a "major case coordinator." (See, Exhibit 1, *c.v.* of Mr. Fife.)

On November 30, 2009, the Government gave notice of its proffer through Mr. Fife as follows:

> "Mr. Fife also concluded that no latent fingerprints were recovered from the M-4 rifle that the defendant obtained from the Chief Warrant Officer (see Bates Label 1240). It is expected that Mr. Fife will testify regarding the general difficulties inherent in obtaining fingerprints from firearms, and will testify that fingerprints are recovered from firearms approximately less than ten percent of the time. Mr. Fife's testimony will include various factors that affect the ability to obtain fingerprints from firearms, including atmospheric conditions, environmental conditions, perspiration, and the surfaces of firearms.
>
> "In addition, it is expected that Mr. Fife will testify about various physical features of individuals that can affect the ability of a fingerprint examiner to obtain fingerprints of value. Related to this point, it is expected that Mr. Fife will testify that the defendant has very small hands and fingers, which negatively affect the ability to obtain fingerprints of value from items with which the defendant has been in contact.
>
> "Mr. Fife's testimony will be based on his experience and training in conducting forensic examinations, including his review of literature relating to this issue, and on his personal participation in this case." (See, Exhibit 2.)[3]

investigators even attempted to test the M4 rifle at issue to see if it has been fired at the time of the incident at or around July 18, 2008.

[3] The Government's November 30, 2009 disclosure of Mr. Fife's proffered testimony was scant at best. A discovery request was forwarded to the Government on December 10, 2009. (See, Exhibit 3, December 8, 2009 letter to Mr. Lavigne from defense counsel.) In *United States v Sabir*, 2005 U.S. Dist. Ct. Motions 5673; 2007 U.S. Dist. Ct. Motions LEXIS 3837, a SDNY case, this same

The proffered testimony is scientifically unreliable under FRE 702 and, as such, is irrelevant under FRE 401 because it cannot resolve a material fact in issue. Further, the proffered testimony of Mr. Fife on the "ten percent" issues is more unfairly prejudicial than probative in that it is offered in an attempt to sway the jurors in favor of the Government's case. It should be excluded.

**3. The Legal Standard for Admissibility of Expert Opinion Proffered as "Science."**

In *Daubert v Merrell Dow Pharms., 509 U.S. 579 (1993),* the United States Supreme Court gave four hallmarks of reliable science to help guide trial courts in their gate keeping role. While these are not the only hallmarks, it is helpful to summarize them here in evaluating a question of scientific reliability. The inquiry may be framed as follows:

a. Is the thing that is being proffered as 'scientific' capable of being tested, and has it been tested? Quoting nineteenth-century philosopher Karl Popper, the Daubert Court wrote: "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id*., at 483-484.

USAO's was heard to complain that the defendant's "proffer of this expert testimony is, at this juncture, extremely vague, as the Government has not yet been provided with either a promised detailed written summary of testimony, nor an expert report." We find ourselves in a similar position with the scant disclosure of Mr. Fife and, indeed, had to do out own literature search for the source of the "ten percent" opinion.

b. Has the theory or technique been subjected to peer review and publication? (Publication is not the *sine qua non* of admissibility and, indeed, is the only one component of peer review. Sometimes what is published is not reliable, and sometimes that which is reliable is not published. But publication ensures "submission to the scrutiny of the scientific community" and is a "component of good science, in part, because it increases the likelihood that substantive flaws in methodology will be detected.") *Id.*

c. Is there a known or potential rate of error? (Do standards exist, and are these maintained in the testing? This is important in relation to the validation of test results through the use of consistent standards and is part of good science.) *Id.*

d. Is the thing generally accepted? (Depending on the case and type of proffered scientific testimony, it may be pertinent to identify a relevant scientific community and to determining the degree of acceptance within that community.) *Id.*

The Joiner Court later clarified the trial judge's gate keeping function under FRE 104(a): The trial judge is not required to accept the conclusions on the expert's opinion on the expert's *ipse dixit* alone but, rather, must have a factual foundation to admit or exclude material proffered as scientific evidence. *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).

The Kumho Court held that the standards of admissibility of expert testimony applied to all areas of expertise and that testing for purposes of legal proceedings

must meet the same rigorous standards of science in the non-legal setting.

*Kumho* emphasized that the expert's methodology must be reliable for his

conclusions to be scientifically reliable. *Kumho Tire Co. v. Carmichael* (526 U.S.

137 (1999). Subsequently, the *Daubert* trilogy was codified in FRE 702, which

states:

> If *scientific*, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence *or to determine a fact in issue*, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is *based upon sufficient facts or data*, (2) the testimony is
> the product of *reliable principles and methods*, and (3) the witness has
> *applied the principles and methods reliably to the facts of the case*. FRE
> 702, *as amended*, 2004. (Emphasis supplied.)

The "ten percent" opinion of Mr. Fife will not assist the jurors to

understand a material fact in issue in this specific case; he cannot be qualified by

skill, experience, training or education – after less than five years in the field – to

render a generalized statement about the percentage of prints visualized on

firearms; the literature upon which he may be expected to rely does not present

facts and data upon which it is ostensibly based; his testimony is not the product

of reasonable principles and methods (as it is unreasonable in his field for him to

rely on scientifically unreliable literature under FRE 705); and, even if the

literature upon which he relies were valid, he does not have enough information

to apply the literature to the facts of this case.

**4. The Barnum Study: Flawed Methodology and Conclusion**

A search of the "literature" for the source of the "ten percent" opinion

yielded one, seven-page article regarding a single retrospective case series study

conducted between 14 and 17 years ago and published 12 years ago: Barnum,

C.A. and Klasey, D.R., "*Factors Affecting the Recovery of Latent Prints on Firearms*," J. Forensic Ident., 141/47(2) [hereafter "the Barnum study," or "the study"]. The study's authors concluded:

> There are a number of factors that affect the fingerprint specialist's ability to recover identifiable latent prints on firearms. These are: the longevity of a latent print due to how it was deposited; atmospheric and environmental conditions; perspiration variation; the nature of the firearm's surface and finish; how the firearm was handled; and packaging. Due to the reasons stated in this article is it difficult to obtain identifiable prints from firearms, but since in the experience of the authors it occurs almost 10 per cent of the time, the attempt should be made. *Id*., at 147. (See, Exhibit 4, Barnum Study.)

The Barnum study is flawed in its methodology and conclusion warranting exclusion of any reference to the "ten percent" opinion under the holdings of *Daubert, Kumho and Joiner,* which are now embodied in FRE 702, as amended, 2004.

As matter of historical fact, *M4 rifles, which were not in service until 1991, were not part of this study.* [4]

The Barnum study involved "an examination" of "1000 weapons." The study fails to distinguish between handguns and rifles. The reader cannot tell how many of the 1000 firearms were handguns or rifles. The important distinction for this case is that a rifle has a stock and a barrel, that is, a larger area on which to transfer prints. We cannot discern from the paucity of 'data' in the Barnum study to what type of firearm the "ten percent" opinion applies.

---

[4] The M4 was entered into service for the U.S. Army in 1997; Go to: http://www.army.mil/factfiles/equipment/individual/m4.html -

Conspicuously absent from the Barnum study are any kind of controls: "Weapons" were sent to the authors' laboratory *at random* from 14 western states and Guam.[5]

The authors state that the ability to visualize prints on weapons depends on such variables as:

1.  "Atmospheric conditions," and "environmental factors," *Id*., at pp 143-144; or

2.  "Processing problems," [what happened to the firearm between the time the latent print was deposited and the time the weapon is recovered?"]. *Id*., at p 145; or

3.  Damage to the friction ridge skin by trauma. *Id*., at p 144; or

4.  Perspiration of the person touching the weapon. *Id*., at 144-145; or

5.  The finish on the firearm.

Despite the Barnum study's articulation of the variables claimed to hinder or prevent visualization and recovery of latent fingerprints on 'weapons,' the authors do not provide us with the raw data to enable us to evaluate these claims for ourselves. For example, the details of the firearms tested by the authors were not laid out in a chart to inform us of how each variable existed in the case of each particular weapon. The study provides no information about atmospheric conditions from where *each* firearm (whatever make, model and type) was sent to the authors' laboratory. It provides no information about how each weapon was

---

[5] The authors of the Barnum study state that their laboratory was "one of three regional A.T.F. forensic laboratories [that] provides forensic services to fourteen western states and the territory of Guam. . . ." See, Barnum study, p 142, footnote 2, para. 2.

"processed," or how the processing was believed to have impacted the retrieval of prints on the firearm. Further, the study does not provide us with any information to permit another forensic scientist to falsify the hypothesis that perspiration in relation to the firearms that were examined in the study from which the "ten percent" opinion derives, prevented the recovery of latent fingerprints. Logically, this hypothesis could not be tested *retrospectively* and, therefore, could not have been subject to falsification in the first place. In the same vein, the study's authors provide no information about latent fingerprints showing trauma.

The scientific method begins with a hypothesis that, by proper study design, is subject to being tested to determine if it can be falsified (this is to avoid the methodological pitfall of confirmation bias). *Daubert, supra.* For example, the Barnum study's authors could have designed a prospective study to determine if prints can be visualized on selected (1) handguns and (2) rifles by study participants (3) with and (4) without perspiration on their hands in (5) different climate conditions, such as dry and humid, cold, hot and temperate. Such as prospective study could have used various latent fingerprint recovery techniques to determine if one is more successful than the other in retrieving prints, depending on the variables in isolation and in combination. A prospective study would necessarily involve the use of controls so, unlike the Barnum study, latent prints of fingerprint recovery personnel would not destroy other prints. The Barnum study cannot be replicated in the absence of data and, therefore, it cannot be validated. In addition, the Barnum study used firearms believed to have been used in crimes. What criminal doesn't know that he should wipe his prints of the

weapon after using it to commit a crime?  The "sampling error" here is blatant. The ten percent opinion in the Barnum study cannot be relied upon as a basis to discount the absence of Dr. Siddiqui's fingerprints on the M4.

One criterion for determining if proffered material meets the standard for admission as reliable *science* is whether it is subject to peer review.  Here, we have a study that masquerades as science because, while it was published in a peer review journal, it failed to provide enough data to enable other forensic scientists to evaluate its purportedly scientific conclusion with explicit probabilistic statement and to evaluate the reliability of that "conclusion."  The very purposes of publication in a *peer review journal* – which is to allow fellow scientists to evaluate, and/or to repeat and validate the study (or not) – is precluded in the Barnum study because of the lack of presentation of data.   This flaw, alone, makes the "ten percent" opinion of the study scientifically invalid and inadmissible in face of the analytical rigors of *Daubert*, its progeny (FRE 702, as amended, 2004) and the Court's gate keeping function under FRE 104(a). The Barnum study does not measure up to the Daubert Court's definition of "science."

The Barnum study was conducted from February 1992 through March 1995.  In the past 14 to 17 years, it is not unreasonable to assume that the practice of visualizing latent prints from weapons – handguns and rifles -- has moved forward considerably so that the ability to visualize and recover latent prints would be greater than ten percent.

Further, the science and technology of visualizing latent fingerprints on various metals and alloys has advanced in leaps and bounds since the 1997

Barnum study.[6]  Perhaps the hypothesis of the "ten percent" opinion should be tested in a new, prospective study.  But, it should not be admitted before the jury in the case at bar as though it is "science."  This would be more prejudicial than probative.

**5. The Experience of Mr. Fife Will Not Bridge the Gap in the Government's Case**

It is reasonable to anticipate, in face of the challenge to the Barnum study's "ten percent" conclusion, that the Government will claim that Mr. Fife can testify, consistent with FRE 702's "experience" basis, that *he* recovers prints ten percent of the time from firearms or, perhaps more specifically, from rifles.  But, this is nothing more than inductive reasoning that is part of hypothesis formation. It is a question, not an answer. In other words, according to the Government's November 30, 2009 disclosure (Exhibit 2), Mr. Fife would testify that because 'Phenomenon' (such as flooding) happens in his backyard all the time when it rains, 'Phenomenon' happens in everybody's backyard every where, every time it rains.  (Obvious questions are: Rains where? Rains how much? With what drainage and soil conditions? On a flood plain, or not?  At the top of a hill, or at the bottom? And so on.) It is not scientific to extrapolate from the specific to the

---

[6] Bond, J.W., "The Thermodynamics of Latent Fingerprint Corrosion of Metal Elements and Allows." J Forensic Sci, November 2008, Vol. 53, No.6.; And, see, Bond, J.W., "Visualization of Latent Fingerprint Corrosion of Metallic Surfaces. J Forensic Sci, July 2008, Vol. 53, No.4; and see, Goddard, A.J., Hillman, R.A., and Bond, J.W., "High Resolution of Imaging of Latent Fingerprint by localized Corrosion on Brass Surfaces." J Forensic Sci, 2009; and see, Paterson, E, Bond, J.W., and Hillman, R.A., "A Comparison of Cleaning Regimes for the Effective Removal of Fingerprint Deposits from Brass." J Forensic Sci, 2009.

general.  Indeed, such extrapolation is a hypothesis at best and rank speculation at worst.   The "ten percent" opinion has no place in this case.

Any  "ten percent" opinion of Mr. Fife "in his experience" is not relevant under FRE 401.  It cannot resolve a material fact in the case because there is no valid scientific support for this in the Barnum study or any reliable study in the literature and, though an expert may testify based on his experience, FRE 702, the Government has provided us with no information about how *Mr. Fife* is able to conclude *after only five years experience, several years of which were assuredly spent in training (and not as a qualified latent fingerprint examiner),* that fingerprints are only retrieved from weapons just ten percent of the time.  The "ten percent" opinion is more unfairly prejudicial than probative in that it will confuse and mislead jury. (See, Exhibit 1, *c.v.* of Mr. Fife; there are no studies or peer-review journal articles by Mr. Fife listed on his *c.v.* regarding research by him on the "ten percent" opinion.)  Further, while Mr. Fife has an interesting background, not one of his job descriptions up until May 2004 involved exposure to friction ridge analysis.  Drawing upon an anecdotal experience of only two or three years experience as a latent fingerprint examiner is statistically minuscule and therefore, statistically meaningless, as a representative sampling. Mr. Fife should not be permitted to quantify the rate unless he has actually been recording data as to how many times he examines firearms, and how many times he sees usable prints.  If he has done so, those data should be produced and subject to examination by the defense prior to a *Daubert* hearing. In the absence of such data, Mr. Fife's memory of the "rate" at which he remembers seeing prints is

liable to the methodological flaw of observer bias and has not been shown to be tested for rate of error.

In this case, where there is no reasonable factual foundation for the pseudo-statistical "ten percent" opinion in either the literature or in the experience of a single fingerprint examiner over just a few years, it would be manifestly erroneous and an abuse of discretion to allow Mr. Fife to testify to his "ten percent" opinion in an attempt to negate the powerful forensic exculpatory fact that Dr. Siddiqui's prints were not found on the M4. *Joiner, supra.*

Further, as the Joiner Court made clear, this Court is not required to accept the expert's conclusion merely on the *ipse dixit* of the expert. *Joiner, supra.*

### 6. Mr. Fife's methodology is flawed: the Court Should Exclude the "Ten Percent" Opinion.

Given the methodological shortcomings of the Barnum study, it is inconceivable that such scientifically unreliable literature is of the sort reasonably relied upon in the field of fingerprint expertise. FRE 703.[7] Indeed, Mr. Fife's reliance on the "ten percent" conclusion exhibits flawed methodology *on his part* warranting exclusion of his opinion.

Most importantly, Mr. Fife has no information about how much or how little, if at all, *Dr. Siddiqui's* hands were perspiring on July 18, 2008, in

---

[7] FRE 703 states: The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. ***If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject***, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. (Emphasis added.)

Afghanistan. Dr. Siddiqui's fingers may be small, but the Government offers no support for the proposition that this factor, alone, would set the stage for a zero transfer of her fingerprints to the M4 rifle in this case. Not even the Barnum study, with all of its flaws, posits a 'fingers-too-small' hypothesis. One has to ask: How small is too small for transfer to occur? We submit that Mr. Fife will not be able to answer that question to the satisfaction of this Court in its gatekeeper role. The "ten percent" opinion – whether based on the Barnum study and/or Mr. Fife's experience – is the Proverbial house built on the sand.

While the Government has not told us how it tested the M4 rifle for fingerprints of Dr. Siddiqui, we presume – some 14 to 17 years after the Barnum study, and with the advances in the technology used to recover prints – that the recovery rate for prints on weapons may well be much greater than ten percent. In particular, more advanced computer technology increases the likelihood of recovering latent prints of value [8]

In sum, the methodology of the Barnum study, the methodology of Mr. Fife in relying on it, and his evident lack of experience to claim, as a general proposition, that fingerprints are visualized less than ten percent of the time, is flawed and lacks scientific reliability. It is misleading to the jury, unfairly prejudicial and not probative of a material fact in issue. FRE's 401 and 403. To admit such testimony would be manifestly erroneous where there is no reasonable

---

[8] See e.g. The Forensic Consulting Associates of New England web page at http://74.125.155.132/search?q=cache:http://www.forensicconsulting.com/html /spex___afis.html.

factual foundation and would amount to an abuse of discretion. *Joiner, supra; Kumho, supra.*

## CONCLUSION

With faulty study design and gaping holes in its data, the Barnum retrospective, case series study is short on reliable scientific methodology and long on a conclusion that lacks the level of robust, scientific reliability required under *Daubert* and it's progeny, and FRE 702, as amended, 2004.  In fact, the study does not even rise to the level of a hypothesis.  It is not "science" and Mr. Fife's "ten percent" opinion proffered to explain away the powerful forensic exculpatory fact that Dr. Siddiqui's prints were not on the gun should be excluded by this Court in its role as gatekeeper under FRE 104(a) in order to ensure that Dr. Siddiqui receives a fair trial pursuant to U.S.CONST., amend. V. As with any defendant, Dr. Siddiqui's trial must proceed only upon the admission of relevant, competent evidence.

> As stated by the Daubert Court:
>
> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the *scientific validity and thus the evidentiary relevance and reliability* -- of the principles that underlie a proposed submission. *The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.*  (Emphasis added.) *Daubert, supra* at 484.

The "ten percent" opinion should be excluded because it encompasses within it a scientific sheen of statistical power without any scientific basis.  The National Academy of Sciences reviewed the state of forensic science in the United States and, speaking of the issue of empirical data collection, stated:

> Little rigorous systematic research has been done to validate the basic premises and techniques in a number of forensic science disciplines. The committee sees no evident reason why conducting such research is not feasible; in fact, some researchers have proposed research agendas to strengthen the foundations of specific forensic disciplines.[9]

The problems posed by undersized studies with poor methodology and faulty data, and anecdotal testimony (e.g., the "probabilistic" and "about ten percent of the time" testimony) for the forensic science community is that these flaws compromise the integrity a sound, forensic science 'product' in our system of justice. The forensic science community, as much as judges, lawyers, jurors, and the general public are stake holders in the delivery of a sound forensic product in court. The problems caused by probabilistic statements -- such as the "ten percent" opinion – are of such grave concern that world's premier forensic science organization, the American Academy of Forensic Sciences (AAFS), has made this the focus of its 2010 annual meeting.[10] In other words, the issues raised with reference to the proffered testimony of Mr. Fife are part of a bigger picture in which forensic scientists recognize that they are adrift without standards, a situation that puts everyone at risk.

Mr. Fife's testimony is more unfairly prejudicial than probative and, as such, outweighs any relevance it may have. FRE's 401, 402, 403. The equities of the case favor exclusion of the "ten percent" opinion: In recent years the FBI

---

[9] From NAS report "Strengthening Forensic Science in the United States: A Path Forward", National Research Council, National Academy of Science, at 6-5 (pre-pub release), available at: http://www.nap.edu/catalog.php?record_id=12589/, citing as an example, L. Haber and R.N. Haber. 2008. *Scientific validation of fingerprint evidence under Daubert. Law, Probability and Risk* 7(2):87-109.
[10] Go to: http://www.aafs.org/ ; The Academy's title and theme for the 2010 is: "Putting Our Forensic House in Order: Examining Validation and Expelling Incompetence."

made a paradigm shift in that it began to test firearms for DNA as well as for latent fingerprints. The government has not disclosed any DNA test results of the M4 rifle. In the absence of a DNA result, and in the absence of Dr. Siddiqui's fingerprints, the Government now seeks to fill the evidentiary void in its case with the unreliable "ten percent opinion" to suggest that Dr. Siddiqui did put up the gun, but to allay the jurors' concerns that there are no prints, offer the testimony that such prints are only recovered "ten percent" of the time. This stands the Barnum study on its head. The conclusion, while flawed, did make the point that it is worth the effort to try to recover prints from firearms. It was designed to encourage the collection of affirmative evidence. It was not a study that was designed to explain away the absence of exculpatory evidence.

**REQUEST FOR RELIEF**

For the above reasons of fact and law, the Dr. Siddiqui moves that this Court:

1. Order a *Daubert* hearing under FRE 104(a) at which Mr. Fife would be available for cross-examination, and before which the Government would be required to respond to Dr. Siddiqui's request for discovery (Exhibit 3) *and* provide any *other* material upon which Mr. Fife relies for the "ten percent" opinion;

2. Order that Mr. Fife's "ten percent" opinion is to be excluded from evidence at trial pursuant to *Daubert* and its progeny, FRE 702, as amended, 2004, FRE's 401 and 403;

3.      Grant any other relief this Court deems just under the

circumstances.

Respectfully Submitted,

*s/ Elaine Whitfield Sharp*

_____

Elaine Whitfield Sharp, Esq.
WHITFIELD SHARP & SHARP
Attorneys and Counselors at Law
196 Atlantic Avenue
Marblehead, MA 01945
Tel: 781.639.1862
Fax: 781.639.1771
Mobile: 617.680.9553
*Attorney for Aafia Siddiqui*

*s/ Dawn M. Cardi*

_____

Dawn M. Cardi, Esq.
Chad L. Edgar, Esq.
Dawn M. Cardi & Associates
Two Park Avenue, 19th Floor
New York, NY 10016
Tel: 212.481.7770
Fax: 212.684.3008
Mobile: 917.575.9159(Ms.
Cardi)
*Attorneys for Aafia Siddiqui*

*s/Linda Moreno*

_____

Linda Moreno, Esq.
P.O. Box 10987
Tampa, FL 33697
Tel: 813.247.4500
Fax: 813.386.6211
*Attorney for Aafia Siddiqui*

*s/ Charles Swift*

_____
Charles Swift. Esq.
SWIFT & MCDONALD, P.S.
2003 Western Avenue, #330
Seattle, WA 98121
206.441.3377 (tel.)
206.448.2252 (fax)
*Attorney for Aafia Siddiqui*