# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,      :      Case No.: 08CR0826

Plaintiff,      :      **Judge Berman**

vs.      :

AAFIA SIDDIQUI,      :

Defendant.      :

## DECLARATION OF WILLIAM TOBIN IN SUPPORT OF DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY AND OPINIONS REGARDING POSSIBLE BULLET FRAGMENTATION AND LOSS OF EVIDENCE DUE TO INABILITY TO SECURE CRIME SCENE

I, William Tobin, depose and declare as follows:

1.      I have a Bachelor of Science degree in Metallurgy from Case Institute of Technology in Cleveland, Ohio, and graduate studies in metallurgy and materials science at Ohio State University and the University of Virginia. While in graduate school, I accepted an offer of employment by the Federal Bureau of Investigation (FBI) as a Special Agent in 1971. After serving approximately 3½ years as a "street Agent," I was assigned to the FBI Laboratory in Washington, D.C., as a Forensic Metallurgist, where I remained until my retirement as the chief

forensic metallurgist in 1998. During my career at the FBI Laboratory, I undertook additional graduate studies in materials science (metallurgy) at the University of Virginia, and also studies for a Master of Arts in Special Studies at George Washington University (GWU), a program sponsored and instructed by both the Forensic Science Department and Law School at GWU. My *curriculum vitae* is attached as Exhibit 1.

By congressional mandate, the FBI Laboratory is charged with providing "assistance to all duly-authorized law enforcement agencies" throughout the U.S. Because no forensic metallurgy component existed in any state, local, or other federal law enforcement entity in the United States, or even in most non-law enforcement entities such as OSHA, FDA, Department of State, *inter alia*, the FBI Metallurgy Unit provided requested assistance for all federal, state and local criminal, civil and nonlitigious matters, and periodically for the international community in foreign police cooperation matters. From the retirement of the Chief Forensic Metallurgist in 1986 until my own retirement in 1998, I was personally responsible for virtually all forensic metallurgical examinations requested of the FBI, for all local, state, federal, and foreign agencies. Such assistance included determination of the causes of the TWA 800 midair explosion disaster over Long Island, N.Y., the nation's worst rail disaster ("Sunset Unlimited" in Mobile, AL), the nation's second worst environmental disaster (oil spill by the "Emily

Berman"), and numerous other high profile incidents. Because of the volume of high profile cases for which I was responsible, my scientific work product has been subject to substantial public scrutiny in the United States and internationally throughout my career as a forensic metallurgist/materials scientist.

2.    Part of my duties as an FBI Agent/forensic metallurgist, was to conduct crime scene searches and to search for, and exhume, human remains, as implied on page 1 of my *curriculum vitae*. Included in my electromagnetic and electronic methodology, and typically the second phase of my searches for human remains, was extensive use of a metal detector, reportedly used in the case at bar in efforts to confirm impact of a bullet with a wall.

3.    Because of my educational and professional background, including employment as a research scientist, as well as my continual interaction with academic and scholarly colleagues, I am intimately familiar with, have incorporated aspects of in various articles I authored or coauthored, and have periodically been requested to lecture on the scientific method. The latest request, with honorarium (which I declined), was from the Judicial Institute of Maryland for a judges-only continuing legal education seminar (CLE), titled "Science in the Courtroom" (topic requested by the judges).

4.    The scientific discipline of metallurgy/materials science is the single most relevant science dealing with metal and other material interactions,

encompassing interactions of solids with other solids, liquids, and/or gases, with deformation and damage of materials in various loading environments (configurations), and with forces, stresses and strains associated with such interactions. One example of interaction of a metal with a liquid or gas environment, which typically results in material degradation, is corrosion. A specialized subset of material science/metallurgy is tribology: the science and engineering study of the interaction of surfaces in forced contact and relative motion, and includes such considerations as friction, wear, and lubrication.

5.    During my metallurgy studies and my tenure as an FBI forensic metallurgist, I visited many metal manufacturing and processing plants throughout the United States and Taiwan to observe a wide variety of industrial manufacturing practices in detail. I also served as a plant metallurgist in both the copper and aluminum industries. Part of my responsibilities as a plant metallurgist included evaluating toolmarks imparted by tools and dies during fabrication and production in efforts to insure efficacy of operations and production continuity, while reducing product variability and breakdown of production tooling. Additionally, I am very familiar with the current practice and methodology of firearm and toolmark examinations inasmuch as I frequently used the same comparison microscopy instrumentation and methodology in my capacity as a forensic metallurgist.

6.    I was requested by Charles Swift, Esq., in his capacity as counsel for Aafia Saddiqui, to review various documents and records, including the following, and to render an opinion as to the scientific basis, *vel non*, of proposed testimony of Carlo J. Rosati as indicated in documents provided pursuant to discovery in the matter *sub judice*:

- Notes of interview of Bashir Ahmad Taraki dated "2 Dec 2, 2009" [sic]

- Six page LaVigne, *et al.*, letter to Swift, *et al.*, dated November 30, 2009, disclosing proposed testimony of Carlo Rosati, *et al.*

- FBI Laboratory report dated August 20, 2009, re FBI Lab Nos. 080805018 QB EA, 081010013 QB EA, 081010014 QB EA.

- 'Statement of Qualifications' (*de facto curriculum vitae*) of Carlo J. Rosati, dated 2/27/2009.

- FBI Laboratory report dated November 19, 2008, re FBI Lab No. 080805018 QB EA

- DVD video of "Shooting Room"

- DVD video of interview of Abdul Qadeer, Chief of Anti-terrorism

7.    The FBI Laboratory reports and LaVigne letter to Swift dated November 30, 2009, indicate that the government intends to proffer testimony of Mr. Rosati, in part, as to:

a) "...his analysis of debris from the crime scene (the room at the ANP Compound) for possible bullets and/or bullet fragments, which was negative."

b) that "he performed a visual inspection of the debris for bullet fragments, and also used a metal detector to search the debris. While the detector indicated the presence of some metal in the debris, it was not sufficient for Mr. Rosati to conclude to a

reasonable degree of certainty that bullet fragments were present in the debris."

c) "...that bullets from an M-4 rifle travel at a very high rate of speed, and can explode or fragment upon impacting hard surfaces, or can penetrate other surfaces. Based on the texture and content of the debris that Mr. Rosati examined in this case, it is expected that he will testify that a bullet fired from an M-4 rifle into a wall comprised of this material might shatter or fragment."

d) "...and how various factors can affect the results of such investigations. These factors include the amount of time that has elapsed between an incident and a crime scene investigation, and how securely a crime scene was maintained before the crime scene investigation occurred. Mr. Rosati also is expected to testify about the possible results that may occur when a crime scene is not preserved or maintained for analysis, including the loss or destruction of evidence."

8.    It is noted that the phenomena to be addressed in items 7(a) thru 7(d) involve issues of material composition, fabrication, processing, interaction and transfer and, accordingly, are appropriately addressed by a materials scientist. It should also be noted that the Association of Firearms and Toolmarks Examiners (AFTE) is self-described as a trade association, and is the principal, virtually exclusive, source of guidelines for firearms and toolmark (F/TM) examiners. It is not a scientific body.

9.    The government's proposed testimony of Paragraph 7(b), above, in insinuating the presence of metal in the debris, is virtually without scientific significance, meaning or probative value. First, based on the documents provided for my review, there are no benchnotes, field notes, photographs, instrumental

printouts, or other records, allowing peer review of the analytical methodology used to detect, and/or basis for interpretation of any signals used to suggest, the presence of metal, other than "visual" and "metal detector." The observation that "the detector indicated the presence of some metal in the debris" is scientifically meaningless and constitutes unsupported empirical claim.

Second, the question arises as to what metal was purportedly "indicated." In decreasing order, the most frequently occurring elements in the earth's crust are (1) oxygen (primarily as $O_2$), (2) silicon (primarily as silica, $SiO_2$), (3) aluminum (primarily as $Al_2O_3$), and (4) iron (primarily as $Fe_2O_3$, or hematite, although numerous other stoichiometric and nonstoichiometric forms are present).[1] The provenance of most building construction materials in less-developed areas of the world is frequently the earth's crust (surface). The "finding" of metal in the debris, absent recognition by visual or microscopic analysis of form as man-made or manufactured product, or controlled comparisons with non-impacted nearby debris for relative presence, is meaningless.

Third, the "indication" of metal presence by a "metal detector" is highly suspect without controlled evaluation of circumstances of signal production. It is quite well known to users that a very high level of 'false positives' (variously described as 'pings', 'beeps', 'tones', *inter alia*) can occur for a variety of reasons.

---

[1] Hamm, Donald J., *Chemistry: An Introduction to Matter and Energy*, Meredith Publishing, New York, N.Y. (1965) at 14.

Although very experienced users can filter (reduce) many of the false positives, they are almost never eliminated, for various reasons. High clay fraction of soil (and, thus, relatively high levels of $Fe_2O_3$ (hematite), $Fe_3O_4$ (magnetite), FeO, and $Fe_xO_y$ (various non-stoichiometric forms), which frequently gives clay a reddish appearance) frequently triggers false positives; background (non-sample) signals; and a dramatic change in surface contour (as, for example, a hole, mound drop-off, other surface anomalies, twigs, roots, sticks, *etc.*, when scanning ground surfaces), also trigger false positives. Although it is not likely the specimens were placed on the ground and scanned, it is crucial to know the settings (both environmental and instrumental) under which the implied signal was produced. Without video of the metal detector operation, the validity of any purported "indication" is highly suspect, particularly if the metal detector is used as a field expedient by a relatively inexperienced user, not uncommon in remote scene searches and evidence retrieval. Further, there are nondestructive techniques available in the FBI Laboratory that could have easily and quickly confirmed not only the presence of any metals present, but also performed qualitative (elemental identification) and semi-quantitative (rough compositional) analyses of the metals, both within minutes. The readily available techniques in the FBI Laboratory are X-ray fluorescence (XRF) and energy dispersive spectrometry (EDS), techniques I used in the majority of my forensic investigations.

10.    The proposed testimony of Paragraph 7(c), above, is not only vague and potentially misleading, but also without scientific foundation, depending on how the proffered testimony is phrased. For bullets in general, it is my opinion that expert testimony is unnecessary to describe the 'possible' behavior of a generic bullet against 'hard' and 'soft' targets. It is assuredly common knowledge that bullets can deform, and possibly fragment, against 'hard' objects, and that bullets can possibly penetrate other surfaces. As for the specific ammunition used, I find no underlying benchnotes, field notes or other data or description of the particular ammunition considered by Mr. Rosati in use with the particular M-4, which ostensibly discharged one or more rounds during the events in question. As for the specific materials comprising the purported target (wall), I find no benchnotes, field notes, instrumental output or other material data suggesting what comprises a wall of "this material," implied as the target material serving to "explode or fragment" a projectile under dynamic stress application. The nature of "this material" is critical to assessing energy absorption and, thus, energy available for deformation and fracture of various projectile materials under dynamic loading.

11.    In the field of materials science, "hard" is a vague term and most frequently requires additional modifiers for relative comparison. At one end of the 'hard' spectrum in physics and materials science is 'rigid.' A 'rigid' body is one that does not deform. However, in the engineering, aka "real," world, there is no

such thing as a perfectly rigid surface; all materials deform, at least a small amount, when sufficient force is applied. The amount of this deformation and damage during impact correlates with the energy absorbed during contact, and is both time and pressure dependent. Energy available for damage is shared by both target material and threat material. Energy absorbed by the target material in deforming reduces the energy available for deformation and fracture processes of the projectile itself.

12.    There are no notes from field or laboratory examinations, or materials data, as to what round (ammunition) Mr. Rosati considered could "explode or fragment" on hitting the wall comprised of the undefined "this material." The most frequently used M-4 round in the Iraq and Afghanistan theaters, however, is an M855, a round designated as a "penetrator" because of its construction. The M855 round is constructed with a copper alloy jacket, antimonial lead plug (aft), and mild steel penetrator (forward). The penetrator is present, as designed, to do exactly that: penetrate. The mild steel (or hardened steel in some cases) has significantly higher yield and tensile strengths than antimonial lead, requiring much higher forces to deform and fracture (fragment). There are additional considerations relating to failure in compressive loading, target and projectile geometries, that do not appear to have been considered in Mr. Rosati's assessment of projectile behavior. In summary, there appears to be no basis in scientific inquiry to support

an inference as to possible behavior of any of the *specific* projectile (threat) materials impacting the *specific* target material (wall) involved in the incident at issue. Accordingly, any opinion furnished by Mr. Rosati is assuredly based on subjective assessment of general projectile behavior or speculation.

13.    Opinions phrased with "might have", "possibly", "could have", or other expression of feasibility are inherently probabilistic and should be closely scrutinized for probative value, particularly where there are no data or supporting information for the expression to be based on specialized knowledge. In many such cases, the witness has no more expertise than finders of fact, who could also draw such inferences.

14.    Based on my experience as both an FBI field agent and Supervisory Agent at the FBI laboratory, it is also my opinion that prospective testimony as to "possible" results that "may" occur when a crime scene is not preserved, including the loss or destruction of evidence, does not require specialized expertise to so opine.

15.    In summary, the prospective opinions from Mr. Rosati as to what is 'possible', "might have", "could have", "may have", *et al.*, lack the rigor of science and should not be permitted; such inferences emanating from a "forensic scientist" or "forensic examiner", and particularly an FBI employee, imply an aura of infallibility generally associated with scientific endeavor.

I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on: _Dec. 14, 2009_
                  (Date)

_William A. Tobin_
(Signature)    s/William Tobin